# UNITED STATES BANKRUPTCY COURT

# IN AND FOR THE DISTRICT OF ARIZONA

In re COVENANT CHRISTIAN ) Chapter 11 Proceedings
CENTER INTERNATIONAL, INC., ) Case No. 2-06-02386-PHX-CGC
)
) UNDER ADVISEMENT DECISION
) RE: NEW HOPES'S MOTION TO
Debtor. ) LIFT STAY
_____ )

On August 3, 2006, Debtor Covenant Christian International, Inc., filed its Chapter 11 petition. Just over one month later, New Hope Partners, LLC's ("New Hope") filed for stay relief to allow it to foreclose its lien against certain real estate owned by Debtor. Both Debtor and the Lois Cunningham Trust filed objections. An evidentiary hearing was held over the course of three days in December, 2006, and January, 2007.

Debtor is a religious ministry run by Pastor Stacy Lee and his wife. Debtor purchased a commercial building in March, 2005, from Green Capital, LLC for $1,175,000 financing most of the purchase price through a short term loan from Mortgages, Ltd. and a carry-back from Green Capital for $137,056.13.[1] The loan with Mortgages, Ltd. was secured by a deed of trust on the real property and a security interest in Debtor's personal property. Pastor Lee and his wife personally guaranteed the loan. The loan from Mortgages, Ltd. was a 12-month, interest-only loan with a March 4, 2006, maturity date. The expressed intention of Debtor was to refinance the loan before the March 4, 2006, maturity date with another lender and repay the loan in full.

The loan agreement provided for a non-default interest rate of 11.5% and a default rate of 27%. The loan also contained a 35% late charge "of the monthly Principal and Interest or Interest Only payment." Further, in the event the loan was not paid in full by the maturity date, a charge would be assessed "in the amount of 3% of the remaining principal balance of

---

[1]This loan was taken out by the Cunningham Trust, a current creditor and objector to the motion for relief from stay.

the loan" on a monthly basis until paid in full. Debtor also agreed to pay other fees in the event of default that were itemized in a Fee Schedule incorporated into the loan package, including particularly a "Performance Plus Admin Fee" that will be discussed in more detail below.

The loan documents provided that Mortgages, Ltd. could sell or assign the loan at any time. In a typical transaction, Mortgages, Ltd., soon after or contemporaneously with funding the loan, would create fractional interests in the promissory note secured by the original deed of trust and sells those interests to various investors, retaining the right to repurchase the fractional interests upon default. In the event of default, the repurchased loan would then be resold under a program known as "Performance Plus" to a single investor who pays Mortgages Ltd. a fee to acquire the defaulted loan. As set forth in the loan agreement with Debtor, this fee varies, calculated as 1.5% of the loan balance with a minimum of $1,500.

As noted, the default rate interest (in addition to the post-maturity late fees of 3% per month) is 27%. Under the Performance Plus agreement, the Performance Plus investor is entitled to the first 18% of the default interest with the remaining 9% going to Mortgages, Ltd.[2]

The Performance Plus agency fee is 1.5% of the principal balance, which is refundable upon recovery of the collateral or payment of the loan. The purchase price includes all amounts necessary to bring the loan current and make the previous investors "whole." In effect, the Performance Plus investor buys the right to receive up to 18% on recovery of the defaulted loan by paying the loan in full, including all accrued but unpaid interest, plus the Performance Plus fee. According to the testimony (and the exhibits are also silent on the point), there is no legal obligation for Mortgages Ltd. to pay the 18% if the amount recovered in collection is insufficient to pay that amount.

While Debtor was late making the first payment under the loan, it made most of the subsequent monthly interest-only payments until the loan came due. At the time of maturity,

---

[2]This scenario assumes that the recovery on the loan is sufficient to pay these amounts. It is more accurate to say that the investor is entitled to the first interest dollars recovered, up to 18%, and Mortgages Ltd. up to the next 9%. In addition, Mortgages Ltd. is entitled to receive all other fees, including post-maturity late fees.

Debtor was unable to pay the loan in full because it had been unable to secure refinancing. The loan went into default and notice of default was provided to Debtor. At about the same time, around March 9, 2006, Mortgages Ltd. sold the defaulted loan to New Hope Partners, LLC, for $1,160,090.11, which represented the full principal balance owing Mortgages Ltd., all accrued but unpaid interest, property taxes, other unpaid charges, and the $16,125 Performance Plus Fee.

Although in default, Debtor managed to negotiate several extensions of the scheduled trustee sale to attempt to refinance the property and stave off foreclosure. Under the first extension agreement, Pastor Lee, on behalf of Debtor, executed an agreement that the full payoff amount as of the extended payoff date of June 29, 2006, would be $1,401,557.39, which would include the previously mentioned Performance Plus Fee, calculated at $16,125, and a $16,125 Trustee's Sale Extension Fee. Fees of this sort were described in the Settlement Statement attached to the extension agreement.[3] Under the second extension agreement, Debtor agreed that the new payoff amount as of July 31, 2006, would be $1,461,540.54, which again expressly included the $16,125 Performance Plus Fee and the $16,125 Trustee's Extension Fee. In addition, Debtor was also charged an additional Trustee's Extension Fee of $16,125 (also referred to as the Forbearance Fee) to extend the loan from June 29, 2006, to July 31, 2006.[4]

Even with the two extensions, Debtor was unable to refinance the debt; therefore, to prevent foreclosure, Debtor filed this bankruptcy. At the time of the stay relief motion, New Hope claimed the property was worth about $1.5 million with encumbrances against the property totaling over $1.9 million, including the $1,464,712.65 owing to New Hope and obligations owing the Louis Cunningham Trust, various contractors, and the Maricopa County Treasurer. Debtor objected to stay relief, challenging the $1.5 million valuation, the assignment of the loan from Mortgages, Ltd. to New Hope as an "illegal joint venture," and the

---

[3]Debtor contests whether the actual fees were adequately disclosed.

[4]The total Debtor agreed to pay in extension fees, therefore, was $32,250. These fees were paid to Mortgages, Ltd., not New Hope.

3

amount of New Hope's claim. The Louis Cunningham Trust also objected, challenging the amount of New Hope's claim, the appraisal and New Hope's contention that Debtor will not be able to refinance the property.

The stay relief motion proceeded to trial, at which time the parties stipulated to a fair market value of $1,670,000 for purposes of the motion. Debtor continued, however, to challenge the validity of the transfer of the loan to New Hope as illegal. Originally, Debtor had indicated that it would bring a case for affirmative relief against New Hope and/or Mortgages Ltd. as a counterclaim to New Hope's proof of claim. The Court expressed skepticism at this procedural approach to addressing the problem. Subsequently, in early 2007, Debtor filed a ten count adversary complaint against Mortgages Ltd., New Hope and Mortgages Ltd. Securities LLC seeking both legal and equitable relief on a variety of theories.[5]

As part of its objection, and now its lawsuit, Debtor challenges the amount of New Hope's claim, arguing, in part, that the undisclosed deal struck between New Hope and Mortgages, Ltd. resulted in additional fees being owed by Debtor to New Hope and/or Mortgages, Ltd. and resulted in unfair "kick backs" to Mortgages, Ltd. at Debtor's expense. In particular, Debtor challenges the $16,125 Performance Plus Fee New Hope agreed to pay Mortgages, Ltd., arguing that "Mortgages Ltd. and New Hope agreed among themselves that the Debtor would have to pay for the premium/profit received by Mortgages Ltd. for selling the defaulted Mortgages Limited Note." According to Debtor, this resulted in Mortgages Limited being paid a profit twice on the defaulted loan. In addition, the Debtor attacks the various late fees and other charges as inadequately disclosed and excessive. Similarly, Debtor complains that Section 4.3 of the Loan Sale Agreement "splits up the loan recovery so that the principal and eighteen percent (18%) of the interest on the Mortgages Ltd. Note go to New Hope, but all 'excess' interest would be a kick-back to Mortgages, Ltd." Debtor also complains that the $32,250 forbearance fee it paid should be applied to the outstanding principal balance of the

---

[5]Adv. Proc. 07-00055 filed January 26, 2007.

4

loan to further reduce New Hope's claim.

The issue is whether these claims or defenses are ripe for decision at the stage of this motion for relief for stay. The Court concludes that they are not. New Hope has established the *prima facie* facts concerning the loan and a colorable secured claim of $1,464,712, subject to reduction or disallowance through the litigation process. Debtor's challenges are complex and fact intensive and therefore not subject to rapid decision.[6] However, clearly, the amount of the New Hope claim needs to be determined promptly; if the debt is legitimate and calculated in accordance with the loan documents, the very likely result will be that no plan will be feasible because the debt will far exceed the value of the property, no matter what that value may eventually be determined to be. And, the evidence strongly suggests that no refinance or repayment of the debt is likely at that level because of the lack of equity to support the necessary loan to value cushion. In short, if Debtor is unsuccessful in its attack on the validity of the debt, the stay should be lifted because there would be no equity in the property and an effective reorganization would not be reasonably in prospect.[7] On the other hand, if Debtor can establish substantial set offs against the claim, or its invalidity *in toto*, then the landscape is radically altered.

However, to get to the point of determining those questions takes time. During that time, New Hope is precluded from exercising its remedies by the automatic stay and is prevented from receiving what it views as the benefit of its bargain. Given the *prima facie*

---

[6]For example, this is not a case where the deed of trust was improperly recorded or the promissory note was not signed. Rather, Debtor's challenge is not so much to the existence of the loan documents but to their validity.

[7]This conclusion assumes that the necessary debt repayments will come from the Debtor and not third party sources. The New Hope debt is guaranteed by the Lees and the evidence suggests that they have very substantial economic resources if they choose to tap them. However, the record discloses no commitment of any kind by the Lees to provide the necessary financial infusion.

5

1  proof of the New Hope claim, the lack of equity in the property,[8] the novelty of Debtor's attack
2  on the New Hope claim,[9] the lack of any payments by Debtor since the beginning of the case,
3  the lack of any operating reports since October, 2006 (and the modest amount of revenue
4  indicated in those reports that were filed prior to that time[10]), the other debts secured by the
5  property, the demonstrated inability of the Debtor to refinance the debt prior to maturity (at a
6  time when all of the complained of extra fees, default interest and late charges had not yet
7  accrued and would have been avoided), the Court concludes that substantial payments are
8  necessary to continue the stay in place. It is the Debtor's burden to demonstrate that an
9  effective reorganization is reasonably in prospect; it is not enough simply to assert that without
10 the building, the church will have to relocate or close. These payments will serve two purposes;
11 the first, and less important, is to compensate New Hope for the continued delay[11] and the
12 second, and more important, is to demonstrate Debtor's ability to perform, thereby providing
13 some evidence of feasibility. Without that, stay relief is appropriate under Section 362(d)(2).

14      The Court concludes that the appropriate payment amount is represented by the
15 calculations made in footnote 8 and therefore will require payments in the amount of $14,000 to
16 be made on the 20th of every month, beginning with the 20th of March. Payments are to be
17 made to Mortgages Ltd. and held pending further order of the Court. If the payments are not

---

[8] The total amount owing to all creditors and secured by the property totals more than $1.8 million. The agreed fair market value of the property is only $1,670,000. For the purposes of this motion, there is no equity.

[9] A question presented is how big would Debtor have to win not to still face defeat. As an example, for Debtor to reorganize successfully, would it be enough simply to restore the debt to the principal advanced plus accrued and unpaid interest at the non-default rate? Even with that result, a refinance as of now would require a property value of nearly $1.45 million and monthly payments in excess of $14,000. The record is certainly not clear that this would be feasible for this Debtor.

[10] In its initial operating report, the debtor estimated approximately $47,000 a month for receipts in September and October. The actual receipts were approximately $27,000 for each month. Disbursements for those two months averaged $23,000.

[11] There is no evidence in the record that the value of the collateral is depreciating.

6

received in a timely manner, a five day notice to cure must be given. Failure to pay within the cure period will result in the lifting of the automatic stay. Only two such notices must be given; thereafter, the payments must be strictly received by the 15th of the month. The allocation and application of these payments will be determined at a later time. Counsel for New Hope is to submit a form of order consistent with this memorandum decision.

So ordered.

**DATED: March 1, 2007**

*/s/ Charles G. Case II*
CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

**COPY** of the foregoing mailed by the BNC and/or sent by auto-generated mail to:

Donald L. Gaffney
Eric S. Pezold
Snell & Wilmer, LLP
One Arizona Center
400 E. Van Buren
Phoenix, Az. 85004-2202
Attorneys for Debtor

John R. Clemency
Todd A. Burgess
Tajudeen O. Oladiran
Greenberg Traurig LLP
2375 E. Camelback Rd., Suite 700
Phoenix, Az. 85016-9000
Attorneys for New Hope Partners, LLC and Mortgages Ltd., as servicing agent for New Hope Partners, LLC

Office of the U.S. Trustee
230 N. First Ave., Suite 204
Phoenix, Az. 85003

J. Scott Burns
Burns and Burns PC
2828 N. Central Ave., Suite 1110
Phoenix, Az. 85004
State court counsel for the Lee's

7

1  LeShawn Jenkins
   Quarles & Brady Streich Lang
2  Two N. Central Ave.
   Phoenix, Az. 85004
3  Attrorneys for Mitch Corp.

4  James M. Maldonado
   Jennings, Haug & Cunningham
5  2800 N. Central Ave., Suite 1800
   Phoenix, Az. 85012
6  Attorneys for Interstate Mechanical Corp.

7  J. Henk Taylor
   Lewis & Roca LLP
8  40 N. Central Ave.
   Phoenix, Az. 85004
9  Attorneys for Louis Cunningham Trust