UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF ARIZONA

| In re COVENANT CHRISTIAN CENTER INTERNATIONAL, INC., | ) ) ) ) ) ) ) ) | Chapter 11 Proceedings Case No. 2-06-02386-PHX-CGC UNDER ADVISEMENT DECISION RE: NEW HOPES'S SECOND MOTION TO LIFT STAY |
|---|---|---|
| Debtor. | | |

**I.   Introduction**

On August 1st and 2nd, 2007, this Court heard testimony and argument on the Emergency Motion for Relief from Automatic Stay (the "Stay Relief Motion") filed by New Hope Partners, L.L.C. ("New Hope") through its servicing agent Mortgages Ltd. ("ML") (collectively referred to together hereinafter as "Movant"). For the following reasons, this Court denies relief under Section 362(d)(1) and defers decision under 362(d)(2) contemporaneously with the pending motion to dismiss the Adversary Proceeding.

**II.   Background**

To briefly recap. Debtor borrowed $1,075,000 from ML in March, 2005. Under the loan, Debtor was to pay interest only for one year and at the end of the year, have refinanced the loan with a long term lender. Immediately after execution, ML sold the loan to a pool of participating investors. When the loan matured without payment in March, 2006, the original investors were paid off and the loan resold to New Hope under the so-called Performance Plus program. According to ML, the current balance owing is just under $2.6 million, resulting largely from numerous fees, default interest and attorneys fees.

This is New Hope's second stay relief motion. The first stay relief motion was resolved by Court order dated March 1, 2007, in which this Court ordered Debtor to make monthly payments of $14,000 as adequate protection. Debtor is current on these adequate protection payments. This second Stay Relief Motion is the result of a May 29, 2007, property inspection by ML's construction manager, Chris Welsh, in which he concludes that New Hope's collateral,

the property out of which Debtor operates as a church, has been "severely damaged." Based on this report, New Hope argues that "cause" exists under Section 362(d)(1) for modification of the stay because the value of its collateral has been diminished by the unauthorized demolition and construction to the property. In addition, New Hope argues that it is entitled to relief under Section 362(d)(2) because there is no equity in the property and there is no reasonable possibility of a successful reorganization within a reasonable time due to the Debtor's lack of operating income on a post-petition basis.

**III.  Discussion[1]**

Much of the controversy surrounding the Stay Relief Motion results from Debtor's interior alterations to the building. The building was originally built as a Luby's Cafeteria restaurant. Of its nearly 10,000 square feet, approximately 2/3 was devoted to food preparation, storage and service, and the remaining 1/3 to the dining area. ML claims that the entire commercial kitchen area was supposed to remain during the term of the ML loan; Debtor asserts that ML was fully aware that much of the former kitchen and food preparation area would be demolished and renovated for church purposes using funds from other sources. Everyone agrees that the ML loan was not a construction loan, but rather a bridge loan to enable Debtor to acquire the property, move the church from its previous location and have the time necessary to obtain long term financing. Further, the facts establish that the kitchen and food preparation area was largely demolished beginning in 2005, soon after Debtor acquired the property, and has now been transformed into a space for teens and pre-teens, a nursery, a multipurpose room, a media room, several offices and a relatively small food storage and preparation area. The most recent phase of the renovation started on April 22, 2007, and is now close to final completion.

ML claims not to have known of the demolition and renovation until the inspection by Welsh on May 29, 2007. ML further asserts, and it is not controverted, that the work was done without approval from or notice to either ML or the Court. Further, ML claims that the value of its collateral has necessarily been diminished by the removal of the "commercial kitchen"

---

[1] This memorandum decision contains the court's findings of fact and conclusions of law as required by F.R.B.P 7052.

because it limits the usefulness of the property to another user. However, it produced no witness to testify on the extent of the claimed diminution.[2]

The evidence on the parties' understanding at the time of the original loan is contradictory. ML introduced a "Property Valuation" report (Movant's Exh. 5, Bates 288) that states: "Commercial kitchen in place and will remain for church use." However, the same document states: "$150k will be spent on tenant improvements–not part of this loan." The actual loan documents do not contain an express prohibition on removal of the kitchen or substantial internal renovation, other than boilerplate language in the Deed of Trust that "Trustor shall not remove or demolish any Improvements on the Real Property." (Movant's Exh. 10, Bates 1135). On the other hand, Stacy Lee, pastor of the church, testified that senior representatives of ML were fully aware of the church's intention to renovate the interior to make it suitable for church use and that he repeatedly invited them to visit the church to see the progress. Indeed, he testified that ML owner and CEO Scott Coles personally referred him to another lender for the purpose of obtaining the financing necessary for the internal renovations. Debtor's architect, Terry Sewell, testified that the kitchen existed of "piles of stuff" and was not functional as a restaurant or a kitchen when he was hired to oversee the demolition and renovation in early to mid 2005.

Additionally, it is counterintuitive that prohibition of demolition and renovation was intended by the parties to be part of their loan agreement, given the fact that the property was clearly not useable as a church in its original condition and that without a space to conduct its business, the church would likely die. The best that can be said is that ML's intent was that the collateral would remain fundamentally the same during the one-year term of the loan and then would be changed thereafter upon refinancing. But it is highly unlikely that the church would have agreed to that condition, had it actually been clearly spelled out in the loan documents, given the church's need for space to conduct the non-worship service portion of its ministry and

---

[2] Welsh was asked whether he knew the economic impact of the removal of the kitchen. His proposed testimony based upon a telephone call to a third party was excluded.

its inability to do so in the space configured as a kitchen.

Finally, Sewell testified that "75%" of the interior renovations were done in 2005, including demolition of the entire kitchen and food serving area. Walls were removed, ceilings taken out, floors removed and new concrete poured. Pastor Lee identified photos he had taken in April 2005 showing the demolition and the beginning of the renovations. Undoubtedly, the demolition was very extensive.[3] Notwithstanding this uncontested testimony, ML takes the position that, when Welsh inspected the property in May, 2007, the extent and existence of the renovations came as an unwelcome surprise. However, Welsh's foreclosure inspection reports for March, May, June and August, 2006, prepared after the 2005 demolition but before the "Phase 2" work done in 2007, uniformly note the property as in "good repair" and that renovations are underway. For example, the June report, Respondent's Exhibit 7, states: "Property is being used as a church. No evidence of any damage at this time. Some interior renovations are being completed creating meeting rooms and child care space in building. Building is secured and is in same general condition as previous inspection." Likewise, the May report, Respondent's Exhibit 9, states: "Main sanctuary is complete and is being used. Several areas are under construction at the time of inspection. Drywall and metal studs in place in many areas, ceiling drops are not yet installed." At this point in time, there could have been no doubt that the "commercial kitchen" that was seen by Welsh in the initial inspection in February 2005 no longer existed and any testimony or evidence that ML was unaware of this fact is simply not credible. Indeed, Welsh's own reports make it clear that the meeting and child care space now existed and that new walls had been constructed. The evidence is further undisputed that such space is directly in the area formerly occupied by the "commercial kitchen."

Finally, the testimony of both Sewell and Lee establishes that Phase 2 of the renovations had to be completed in order to address concerns of the City of Peoria and to obtain a certificate

---

[3]Introduced through Sewell were the original "as built" plans obtained from Luby's, Sewell's demolition plan, and the floor plan for the totally renovated space. Respondent's Exhs. 19, 20 and 21.

4

of occupancy. While the certificate has not yet been issued, the uncontroverted evidence is that it is likely to be so in the near future after completion of the remaining inspections and tests.

As noted above, Welsh's report that the property was "severely damaged" triggered the filing of this motion. Yet Welsh testified that the "severe damage" was not of a physical nature but rather his conclusion because of the change in the nature of the use, the lack of approval by ML (of plans, budget, etc.) and his lack of knowledge of whether the appropriate permits and inspections had been obtained. It is curious that he relies so heavily on the "change of use" in reaching that conclusion, given that each of his 2006 reports acknowledges use as a church and the construction of meeting and related facilities. Even though ML complains that by the time it discovered that construction was going on in the Spring of 2006 the loan was in payment default and the "damage was already done," there is no expression of outrage, or even mild concern, in his 2006 reports. And, Letitia Ritter, ML's Non Performing Loan administrator, confirmed that the interior renovations were never an issue of concern at the NPL meetings she attended with senior management, notwithstanding the discussion of them in Welsh's reports.

Given this record, the Court finds that there was no mutual understanding at the time of the loan that demolition and construction was prohibited. Further, the Court finds that ML was aware of the demolition and renovations no later than May, 2006, yet expressed no concern and took no action. Debtor has satisfied its burden that the renovation has not resulted in demonstrable and measurable diminution in the value of ML's collateral, that the construction in 2007 did not result in "severe damage" to the building, and that there is no credible evidence that the value of the collateral has been affected by the demolition and construction. Therefore, the Court concludes that cause does not exist for modifying the stay based upon Welsh's report of "severe damage."

This does not end the Section 362(d)(1) inquiry, however. ML also asserts that cause exists because the alterations were not approved either by ML or the Court, that pre-petition debts have been paid without Court authority, that Debtor is unable to make adequate protection payments without "phantom loans" and that non-ordinary course debt has been incurred without

5

Court authority.

Although cause is a broad term, its common meaning in the context of Section 362(d)(1) relates to the collateral as to which a creditor is stayed from enforcing its remedies. "Cause" also is used, for example, in the context of motions to dismiss under Section 1112 as that section was amended by BAPCPA. The Court concludes that such allegations, while possibly relevant under Section 1112 or Section 362(d)(2)[relating to the lack of likelihood of confirming a plan in a reasonable time period)], are not relevant to a Section 362(d)(1) inquiry and therefore concludes that, on this record, cause for modifying the stay does not presently exist.

That leads to a discussion of Section 362(d)(2). Under this subsection, stay relief is available if the debtor lacks equity in the collateral and the collateral is not necessary to an effective reorganization. It is the movant's burden to show lack of equity and indisputably ML has not introduced any evidence on this point as part of this record. However, at the previous stay relief hearing, the parties stipulated to a value of $1,670,000 without the reservation that such valuation was for the purposes of that motion only.[4] As noted by ML, this value is now law of the case, at least as far as stay relief goes. As pointed out in the previous stay relief decision, ML made a colorable claim that its debt (together with the Cunningham debt and unpaid real estate taxes) exceeds that amount and, with the additional charges asserted in this hearing, the debt, if valid, clearly exceeds the stipulated value. Therefore, the only issue for consideration is whether an effective reorganization is reasonably in prospect.

ML correctly points out that the Debtor is routinely delinquent in the filing of its monthly reports, that such reports (when filed) show a modest amount of income and expenses either equaling or exceeding available cash, that Debtor requires substantial unspecified gifts from parishioners to meet its obligations, that the construction recently recommenced and now almost completed was not disclosed to or approved by either the Court or ML, that the claims litigation

---

[4] Even if there had been such a reservation, the Court would be likely to hold the parties to their stipulation in a subsequent stay relief matter such as this one. Such reservations are typically used to keep the issue of value open for confirmation purposes.

6

(in which Debtor seeks both to disallow ML's claim and to recover affirmative damages) has not proceeded beyond the initial pleading stages with the discovery cut off date fast approaching, that overall post-petition payables have increased since the filing and that the Debtor has not come forward with any available refinancing source since the commencement of the case. All of these factors suggest that an effective reorganization may not be in prospect.

These are serious matters indicating a lack of disciplined effort by the Debtor to conform to the requirements of the bankruptcy code in a Chapter 11 case. For example, to satisfy the Bankruptcy Code's transparency requirements, Debtor should have disclosed in its operating reports that obligations of the estate were being paid from third parties, including the amount of each such payment.[5] If, as is apparently the case, the Debtor wished to keep the identity of these donors confidential, an appropriate mechanism should have been proposed **by the Debtor** for the details to be filed under seal, or in camera, or subject to an appropriate protective order. The Court could not have been clearer at the scheduling conference that the details of any such transactions needed to be available at the time of the hearing. Notwithstanding that fact, all that was produced was a chart generated in court with no names and no verifiable proof. Such is not the stuff of confirmable Chapter 11 cases, particularly where every indication is that confirmation will only be possible if there are substantial infusions of cash from sources in addition to the amounts routinely received during the course of the case to date.

For its part, Debtor argues that its claim against ML is valuable, will eventually reduce or eliminate the ML debt and will allow for a successful reorganization. Further, it argues that only $1,250 of the debt incurred post-petition to contractors for the renovation remains unpaid, relying upon the testimony of Pastor Lee that a substantial amount of that debt has been paid directly to contractors by unnamed parishioners. Of course, the difficulty of the last point, from

---

[5]As an example, on Page 7, Case Status Questionnaire is the following:"Have any funds been disbursed from any account other than the Debtor in Possession Account." Of course, this question can be carefully parsed to argue that the disbursements are not from the Debtor and therefore need not be disclosed. But transparency is a not a matter of parsing or creative reading; it is a matter of informing the Court and other interested parties on what is going on in the case.

7

the standpoint of assessing the likelihood of a successful reorganization, is that (1) the Debtor has not indicated that there are any legally binding commitments to provide additional funding in the future and (2) that the identity of the donors has been withheld by the Debtor on privacy and religious freedom grounds. Finally, it argues that ML was fully aware of the renovations at the time the loan was made and that no other approvals are necessary because, under the circumstances of this case, completing the renovations was in the ordinary course of the Church's business.

The bottom line of this case is that, based on the current record, it appears highly unlikely that the Church will be able to confirm a plan within a reasonable period of time unless the ML debt is dramatically reduced by disallowance to some degree or set off or both. The situation is very similar to what existed when the Court stated the following in its March 1, 2007 Memorandum Decision on ML's first stay relief motion:

> Debtor's challenges are complex and fact intensive and therefore not subject to rapid decision. However, clearly, the amount of the New Hope claim needs to be determined promptly; if the debt is legitimate and calculated in accordance with the loan documents, the very likely result will be that no plan will be feasible because the debt will far exceed the value of the property, no matter what that value may eventually be determined to be. And, the evidence strongly suggests that no refinance or repayment of the debt is likely at that level because of the lack of equity to support the necessary loan to value cushion. In short, if Debtor is unsuccessful in its attack on the validity of the debt, the stay should be lifted because there would be no equity in the property and an effective reorganization would not be reasonably in prospect. On the other hand, if Debtor can establish substantial set offs against the claim, or its invalidity *in toto*, then the landscape is radically altered.

What has changed, however, is the passage of time, with the resulting increase in interest, fees, and expenses, as well as the renovations about which there has been so much dispute. This case was filed a year ago, August 3, 2006. At that time, Debtor announced that it would challenge ML's debt on numerous bases and filed an original claim objection on October 10, 2007. The default order disallowing the ML claim was subsequently vacated and the various attacks upon and objections to the ML claim were incorporated in the adversary proceeding filed on January 26, 2007. ML filed a motion to dismiss on March 20, 2007, which was heard on May 30 and which remains under advisement. In between these two events, on April 10, 2007, the

8

Court held a Rule 7016(b) conference at which a discovery cut off of August 8, 2007, was established at the suggestion of counsel. At the time, the August 8 date was established, the Motion to Dismiss had been filed as well as a Motion to Withdraw the Reference. Therefore, at the time counsel agreed to the August 8 deadline, all of the procedural pieces of the puzzle, as they currently exist, were in place.

However, there is little to suggest that the claims issues are much closer to resolution than a year ago. While the Court readily acknowledges that the Motion to Dismiss has been under advisement for two months, that fact did not affect the original discovery schedule. Indeed, scheduled for hearing on August 7, 2007, is Debtor's motion to "reset pretrial schedule," in effect, a motion to extend the discovery deadline for another three months.

ML suggests that the two issues can be bifurcated; i.e., it argues that the pendency of the adversary proceeding should not impeded ML's right to realize on its collateral. This is a bit facile as the collateral is of course the primary church property, now improved (if one accepts the position of the church) by both church funds and individual donations. Given the nature of the Church's operations (well known to ML when it made the loan), it is unlikely that, if the Church ultimately is found to be entitled to relief, such relief would be complete if the church property were lost at this point.

Putting all of these considerations together, the Court concludes as follows. The motion for stay relief under Section 362(d)(1) is denied. Final decision on the motion for stay relief under Section 362(d)(2) is deferred and will be decided contemporaneously with the decision on the Motion to Dismiss.[6] It is very likely that, if full stay relief is not granted at that time, further deadlines and requirements will be imposed upon the Debtor regarding the filing and prosecution of a plan of reorganization, and the compliance by the Debtor in a timely and thorough manner with all of its obligations under the Code, in order to satisfy Section 362(d)(2)(B). If imposed, these will be based largely upon the Court's estimation of the likelihood of the eventual success

---

[6]The Court expects such decision to be issued no later than the end of this week.

of the adversary proceeding together with an assessment of whether the Debtor truly has the wherewithal to confirm a plan. To put a finer point on it, if, for example, the likelihood of success of the adversary proceeding were deemed to be small and the ML secured claim were capped at the stipulated value of the property, $1,670,000, (allowing fees and charges disputed by the debtor but to a maximum of the collateral value under Section 506(b)), a monthly payment at the contract rate of 11.5% over a twenty year amortization would be nearly $18,000.[7] Under such assumptions, that amount would have to be paid for the stay to remain in place to demonstrate feasibility under Section 362(d)(2) and the source of the funds, and the reliability of such source, would need to be critically tested. Of course, this is in addition to the Debtor's compliance with its obligations under the Code.[8]

So ordered.

**DATED:** August 7, 2007

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

**COPY** of the foregoing mailed by the BNC and/or sent by auto-generated mail to:

Donald L. Gaffney
Eric S. Pezold
Snell & Wilmer, LLP
One Arizona Center
400 E. Van Buren
Phoenix, Az. 85004-2202
Attorneys for Debtor

John R. Clemency

---

[7]This discussion is for illustration only and does not reflect a decision by the Court that such treatment would be appropriate under Section 1129(b). Further, the capping of the principal of a secured debt for bankruptcy purposes does not necessarily affect the liability of guarantors for the entire debt.

[8]This decision is made on the motion presented and is without prejudice to any different relief that may be sought by appropriate motion.

| | |
|---|---|
| 1 | Todd A. Burgess |
| | Tajudeen O. Oladiran |
| 2 | Greenberg Traurig LLP |
| | 2375 E. Camelback Rd., Suite 700 |
| 3 | Phoenix, Az. 85016-9000 |
| | Attorneys for New Hope Partners, LLC and |
| 4 | Mortgages Ltd., as servicing agent |
| | for New Hope Partners, LLC |
| 5 | |
| | Office of the U.S. Trustee |
| 6 | 230 N. First Ave., Suite 204 |
| | Phoenix, Az. 85003 |
| 7 | |
| | J. Scott Burns |
| 8 | Burns and Burns PC |
| | 2828 N. Central Ave., Suite 1110 |
| 9 | Phoenix, Az. 85004 |
| | State court counsel for the Lees |
| 10 | |
| | LeShawn Jenkins |
| 11 | Quarles & Brady Streich Lang |
| | Two N. Central Ave. |
| 12 | Phoenix, Az. 85004 |
| | Attrorneys for Mitch Corp. |
| 13 | |
| | James M. Maldonado |
| 14 | Jennings, Haug & Cunningham |
| | 2800 N. Central Ave., Suite 1800 |
| 15 | Phoenix, Az. 85012 |
| | Attorneys for Interstate Mechanical Corp. |
| 16 | |
| | J. Henk Taylor |
| 17 | Lewis & Roca LLP |
| | 40 N. Central Ave. |
| 18 | Phoenix, Az. 85004 |
| | Attorneys for Louis Cunningham Trust |
| 19 | |
| 20 | |
| 21 | _____ |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |